No. 22-35367

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

MONTANA WILDLIFE FEDERATION, et al.,
*Plaintiffs/Appellees*,

v.

DOUG BURGUM, in his official capacity as Secretary of the Interior, et al.,
*Defendants/Appellants*,

and

WESTERN ENERGY ALLIANCE, et al.,
*Intervenor-Defendants*.

Appeal from the United States District Court for the District of Montana
No. 4:18-cv-69 (Hon. Brian Morris, Chief District Judge)

**FEDERAL DEFENDANTS' OPENING BRIEF**

|  |  |
| --- | --- |
|  | ADAM R.F. GUSTAFSON |
|  | *Principal Deputy Assistant Attorney General* |
|  | ROBERT N. STANDER |
| Of Counsel: | *Deputy Assistant Attorney General* |
|  | LUTHER L. HAJEK |
| CLARE BORONOW | DANIEL HALAINEN |
| *Attorney* | *Attorneys* |
| Office of the Solicitor | Environment and Natural Resources Division |
| U.S. Department of the Interior | U.S. Department of Justice |
|  | Post Office Box 7415 |
|  | Washington, D.C. 20044 |
|  | (202) 598-3329 |
|  | daniel.j.halainen@usdoj.gov |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

GLOSSARY ................................................................................................... vii

INTRODUCTION ............................................................................................. 1

STATEMENT OF JURISDICTION ................................................................... 2

STATEMENT OF THE ISSUES ........................................................................ 3

PERTINENT STATUTES AND REGULATIONS ............................................. 3

STATEMENT OF THE CASE ........................................................................... 3

    A.    Statutory and regulatory background ..................................................... 3

        1.    Oil and gas leasing .................................................................... 3

        2.    Greater sage-grouse policy ........................................................ 7

        3.    The One Big Beautiful Bill Act ................................................ 13

    B.    Factual and procedural background ....................................................... 15

        1.    Phase 1 proceedings ................................................................. 16

        2.    Phase 2 proceedings ................................................................. 19

SUMMARY OF ARGUMENT .......................................................................... 22

STANDARD OF REVIEW ............................................................................... 24

ARGUMENT .................................................................................................... 24

I.    Any errors in the Bureau's phase 2 leasing decisions are not
serious enough to warrant vacatur. ............................................................ 25

    A.    The phase 2 leasing decisions align with legislative and
regulatory policy ................................................................................ 25

B. The phase 2 leasing decisions largely did not rely on IM 2018-026. ................................................................30

C. The Bureau can reconsider the phase 2 leases on remand. .................32

II. The consequences of canceling the phase 2 leases weigh heavily against vacatur. ...................................................................33

A. Vacatur would result in significant financial harms to the federal and state governments. ...........................................33

B. The Bureau would likely be required to reoffer nominated parcels for lease at an upcoming sale. ..............................36

CONCLUSION ..................................................................................38

STATEMENT OF RELATED CASES ................................................39

CERTIFICATE OF COMPLIANCE

ADDENDUM

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993)................................................................24

*Cal. Cmtys. Against Toxics v. Env't Prot. Agency,*
    688 F.3d 989 (9th Cir. 2012) ................................................................24

*Conner v. Burford,*
    848 F.2d 1441 (9th Cir. 1988) .........................................................33, 36

*Earth Island Institute v. Carlton,*
    626 F.3d 462 (9th Cir. 2010) ................................................................34

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)..............................................................................28

*Idaho Farm Bureau Fed'n v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995) ..........................................................32, 34

*Mont. Wildlife Fed'n v. Haaland,*
    2022 WL 42794 (9th Cir. 2022) ...........................................................17

*Mont. Wildlife Fed'n v. Haaland,*
    127 F.4th 1 (9th Cir. 2025) ............. 1, 3, 18, 19, 24, 25, 26, 28, 30, 31, 32, 33

*Northern Cheyenne Tribe v. Hodel,*
    851 F.2d 1152 (9th Cir. 1988) ..............................................................34

*Pollinator Stewardship Council v. Env't Prot. Agency,*
    806 F.3d 520 (9th Cir. 2015) ................................................................32

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989)................................................................................7

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
    605 U.S. 168 (2025)..........................................................................7, 28

*W. Watersheds Project v. Schneider*,
417 F. Supp. (D. Idaho 2019) ........................................................11

**Statutes**

5 U.S.C. § 706 ........................................................................................15

28 U.S.C. § 1292(a)(1) ............................................................................3

28 U.S.C. § 1331 .....................................................................................2

30 U.S.C. § 191(a) ...............................................................................6, 34

30 U.S.C. § 226(a) ...........................................................................26, 27, 36

30 U.S.C. § 226(b) ...........................................................................3, 5, 14, 26

30 U.S.C. § 226(g) ...................................................................................6

30 U.S.C. § 226(q) ...................................................................................5

42 U.S.C. § 4332 .....................................................................................7

43 U.S.C. § 1701 ...................................................................................2, 4

43 U.S.C. § 1712 ...................................................................................4, 5

43 U.S.C. § 1732 .....................................................................................8

Federal Land Policy and Management Act
    Pub. L. No. 94-579, 90 Stat. 2743 (1976) ........................................4

Inflation Reduction Act,
    Pub. L. No. 117-169, 136 Stat. 1818 (2022) ....................................5

Mineral Leasing Act,
    Pub. L. No. 66-146, 41 Stat. 437 (1920) ..........................................5

National Environmental Policy Act,
    Pub. L. No. 91-190, 83 Stat. 852 (1970) ..........................................5

One Big Beautiful Bill Act,
     Pub. L. No. 119-21, 139 Stat. 72 (2025) ........................................13

**Rules and Regulations**

43 C.F.R. § 1601.0-5(n) ................................................................4, 5

43 C.F.R. § 3120.12(a) .....................................................................5

43 C.F.R. § 3120.4-2 .........................................................................6

43 C.F.R. § 3120.31 ......................................................................5, 14

43 C.F.R. § 3162.3-1 .........................................................................6

43 C.F.R. § 3120.5-1 ......................................................................5, 6

*Endangered and Threatened Wildlife and Plants; 12-Month Findings*
    *for Petitions to List the Greater Sage-Grouse (Centrocercus*
    *urophasianus) as Threatened or Endangered,*
    75 Fed. Reg. 13,910 (Mar. 23, 2010) ...........................................8

 *Fluid Mineral Leases and Leasing Process,*
    89 Fed. Reg. 30,916 (Apr. 23, 2024).............................................4

*Notice of Availability of the Record of Decision; and Approved*
    *Resource Management Plan Amendments,*
    80 Fed. Reg. 57,639 (Sept. 24, 2015)............................................8

*Notice of Availability of Record of Decision and Approved Resource*
    *Management Plan Amendment for Greater Sage-Grouse*
    *Conservation, Idaho,*
    84 Fed. Reg. 10,325 (Mar. 20, 2019) ..........................................11

*Notice of Intent to Prepare Environmental Impact Statements and*
    *Supplemental Environmental Impact Statements to Incorporate*
    *Greater Sage-Grouse Measures into Land Use Plans and Land*
    *Management Plans,*
    76 Fed. Reg. 77,008 (Dec. 9, 2011)................................................8

*Revision to Regulations Regarding Competitive Leases; Expression of Interest Process*,
90 Fed. Reg. 36,118 (Aug. 1, 2025) ...............................................................4

*Revision to Regulations Regarding Oil and Gas Leasing; Stipulations and Information Notices*,
90 Fed. Reg. 36,114 (Aug. 1, 2025) ...............................................................4

*Revision to Regulations Regarding Onshore Oil and Gas Leasing; General*,
90 Fed. Reg. 36,117 (Aug. 1, 2025) ...............................................................4

*Waste Prevention, Production Subject to Royalties, and Resource Conservation*,
89 Fed. Reg. 25,378 (Apr. 10, 2024) ..............................................................4

# GLOSSARY

| | |
|---|---|
| FLPMA | Federal Land Policy and Management Act |
| NEPA | National Environmental Policy Act |
| OBBBA | One Big Beautiful Bill |

**INTRODUCTION**

The Bureau of Land Management administers roughly one tenth of the United States' land base and a vast swath of the Nation's subsurface minerals. Through the Mineral Leasing Act, Congress charged the Bureau with regularly offering oil and gas resources on these public lands for development, and the Bureau routinely holds public lease sales that yield considerable revenue for the Federal fisc and the budgets of the states where the resources are located. In this case, environmental groups brought a sweeping challenge to the Bureau's leasing decisions across several years and several states, arguing that the Bureau did not adequately prioritize development outside the habitat of the greater sage-grouse, a large ground-dwelling bird. In an initial "phase 1" of litigation over a subset of the challenged leases, this Court affirmed the district court's order vacating the Bureau's leasing decisions. *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1 (9th Cir. 2025). In the present "phase 2" of litigation over five more leasing decisions in Wyoming and Nevada, the district court once again vacated the decisions, requiring the Bureau to cancel roughly two hundred leases and to transfer millions of dollars in public revenue back to the developers.

This Court should order the district court to remand these phase 2 leasing decisions without vacatur. The legal landscape has changed significantly since this Court upheld the district court's phase 1 decision to vacate leases, and there are

1

relevant distinctions in the phase 2 leases. Through the recently enacted One Big Beautiful Bill Act, Congress made clear that the Bureau's existing leasing practices align with legislative policy, and the Bureau has now amended its resource management plans to make clear that the agency's efforts to conserve the sage-grouse and its habitat do not require the leasing procedures that this Court envisioned. If the district court's vacatur decision is upheld, the Bureau would be required by statute to once again offer any nominated parcels for lease, resulting in no significant real-world change affecting the greater sage-grouse or its habitat. The principal effect of vacatur would be the transfer of millions of dollars in revenue from the Federal and state fiscs back to the businesses seeking to develop these same leases.

Because vacatur is not warranted, this Court should reverse the district court's remedial determination and order remand without vacatur.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 et seq.

The district court's interlocutory order vacating the Bureau's leasing decisions is immediately appealable because the order requires the Bureau to unwind leases

2

and refund public revenue. *See Mont. Wildlife Fed'n*, 127 F.4th at 27-30. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

The district court entered its order on March 11, 2022. 1-FedER-16. The federal defendants filed their notice of appeal on May 10, 2022. 4-FedER-600. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

Whether the district court abused its discretion in ordering the Bureau to vacate the leasing decisions rather than remanding without vacatur.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the addendum following this brief.

## STATEMENT OF THE CASE

**A.     Statutory and regulatory background**

**1.     Oil and gas leasing**

**a.** The Mineral Leasing Act of 1920, Pub. L. No. 66-146, 41 Stat. 437, directs the Bureau to lease oil and gas resources on public land to help meet the Nation's energy needs. Leases are sold by the Bureau's state and field offices through public auctions. Congress directed that these lease sales "shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b)(1)(A).

The Federal Land Policy and Management Act of 1976 (FLPMA), Pub. L. No. 94-579, 90 Stat. 2743, governs the Bureau's management of the Nation's public lands more generally. Congress directed the Bureau to adopt land use plans for multiple uses, including meeting "the Nation's need for domestic sources of minerals." 43 U.S.C. § 1701(a)(12). FLPMA structures this process of land-use planning and the leasing of federal minerals. *See generally Oil and Gas*, Bureau of Land Management, https://www.blm.gov/programs/energy-and-minerals/oil-and-gas (last visited Jan. 7, 2026).

**b.** The Bureau employs a three-stage process for leasing and development of oil and gas resources.[1] The first stage is the preparation of a resource management plan to set forth general goals and objectives for a particular area. 43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0-5(n). During this planning stage, the Bureau determines what lands are open for development, along with the constraints that will

---

[1] The Bureau significantly revised its regulations related to oil and gas development in April 2024. *See Fluid Mineral Leases and Leasing Process*, 89 Fed. Reg. 30,916 (Apr. 23, 2024); *Waste Prevention, Production Subject to Royalties, and Resource Conservation*, 89 Fed. Reg. 25,378 (Apr. 10, 2024). These regulations took effect in June 2024 and superseded some of the regulations in effect at the time of the agency actions under review in this case. The Bureau then adopted further revisions to the regulations in August 2025. *See Revision to Regulations Regarding Oil and Gas Leasing; Stipulations and Information Notices*, 90 Fed. Reg. 36,114 (Aug. 1, 2025); *Revision to Regulations Regarding Onshore Oil and Gas Leasing; General*, 90 Fed. Reg. 36,117 (Aug. 1, 2025); *Revision to Regulations Regarding Competitive Leases; Expression of Interest Process*, 90 Fed. Reg. 36,118 (Aug. 1, 2025). Where there are pertinent differences, this brief cites to the relevant regulations with parenthetical notations to the applicable years.

apply to any future leases and development, and establishes general goals and objectives. 43 C.F.R. § 1601.0-5(n). The purpose of this planning process is "to maximize resource values for the public through a rational, consistently applied set of regulations and procedures." *Id.* § 1601.0-2. These plans generally do not authorize individual development projects, but future determinations about site-specific projects must conform to the resource management plan. 43 U.S.C. § 1712(e).

The second stage is the leasing of eligible and available parcels of land through a lease sale. 43 C.F.R. §§ 3120.5-1, 3120.5-3 (2016) (reserved); *see also id.* § 3120.11 (2024). These lease sales are conducted through an auction process. *Id.* §§ 3120.5-1, 3120.5-3 (2016) (reserved); *see also id.* § 3120.12(b) (2024). Where eligible lands are available for leasing, the Bureau's state offices must hold quarterly lease sales. 30 U.S.C. § 226(b)(1)(A); *see also* 43 C.F.R. § 3120.12(a) (2024). Historically, the Bureau has relied on nominations from interested energy companies to aid its determination of what parcels of land to offer for lease at an upcoming sale. These industry nominations of parcels are known as "expressions of interest." *See* 43 C.F.R. § 3120.31. This nomination process was not expressly addressed in the governing statutes until Congress passed the Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 50262(d), 136 Stat. 1818, 2057 (formerly codified at 30 U.S.C. § 226(q)), which enacted a fee for the submission of expressions of interest.

5

After determining what parcels to offer at an upcoming sale, the Bureau posts a public notice of a competitive lease sale. 43 C.F.R. § 3120.4-2 (2016); *see also id.* § 3120.41(a) (2024). The inclusion of parcels in an upcoming sale is subject to public protest. *Id.* § 3120.1-3 (2016); *see also id* § 3120.13 (2024). The leases are offered at auction, sold to the highest bidder, and issued after the Bureau resolves any protests. *Id.* § 3120.5-1 (2016); *see also id.* § 3120.51(b) (2024). Revenues from the sales are paid into the Treasury of the United States, and roughly half of the revenue is then disbursed to the state where the leased lands are located. 30 U.S.C. § 191(a).

The third stage of the process is development of any oil and gas resources on a leased parcel. The proponents of a development project must submit to the Bureau an application for a permit to drill—usually called an "APD"—for each proposed well. 30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-1 (2018). This application includes both a drilling plan and a surface-use plan. *Id.* § 3162.3-1(e)-(f) (2018). The Bureau reviews the application to ensure it complies with the terms of the lease and all statutory and regulatory requirements. *Id.* § 3162.3-1(a) (2018). The Bureau may approve an application for a permit to drill as submitted, approve it with modifications, defer approval, or deny it outright. *Id.* § 3162.3-1(h) (2018).

**c.** The Bureau's management of oil and gas leasing is subject to various other statutory requirements, including compliance with the National Environmental Policy Act (NEPA), Pub. L. No. 91-190, 83 Stat. 852 (1970). "NEPA is a *purely*

6

*procedural statute*" that requires federal agencies to evaluate the environmental effects of certain proposed federal actions. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025) (emphasis in original); *see also* 42 U.S.C. § 4332; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The Bureau complies with NEPA at the planning, leasing, and development stage of oil and gas development, and a significant amount of the Bureau's analysis of its decisions is included in the relevant NEPA documents. The "bedrock principle" governing judicial review of federal agencies' NEPA compliance is "[d]eference" to the agency conducting the environmental analysis. *Seven Cnty*, 605 U.S. at 185.

### 2. Greater sage-grouse policy

The greater sage-grouse is a large ground-dwelling bird dependent on the sagebrush steppe ecosystem of the western United States. The Bureau manages roughly 65 million acres of sage-grouse habitat, totaling more than forty percent of the bird's habitat, and the U.S. Forest Service also manages a significant amount. *See generally Greater sage-grouse,* Bureau of Land Management, https://www.blm .gov/programs/fish-and-wildlife/sage-grouse (last visited Jan. 7, 2026).

**a.** In 2010, the U.S. Fish and Wildlife Service determined that the greater sage-grouse should be listed as endangered or threatened under the Endangered Species Act because of habitat loss. *See Endangered and Threatened Wildlife and Plants; 12-Month Findings for Petitions to List the Greater Sage-Grouse*

*(Centrocercus urophasianus) as Threatened or Endangered*, 75 Fed. Reg. 13,910 (Mar. 23, 2010). The following year, the Bureau and the Forest Service began an extensive planning process for incorporating sage-grouse conservation measures into their land use plans with the goal of avoiding the need to list the sage-grouse as an endangered or threatened species. *See, e.g.*, *Notice of Intent to Prepare Environmental Impact Statements and Supplemental Environmental Impact Statements to Incorporate Greater Sage-Grouse Measures into Land Use Plans and Land Management Plans*, 76 Fed. Reg. 77,008 (Dec. 9, 2011).

At the conclusion of this process, the agencies added a suite of protective measures to 98 land use plans across ten western states, including 77 of the Bureau's resource management plans. These new "sage-grouse amendments" were finalized in 2015. *See, e.g.*, *Notice of Availability of the Record of Decision; and Approved Resource Management Plan Amendments*, 80 Fed. Reg. 57,639 (Sept. 24, 2015).

The 2015 sage-grouse amendments set out a series of objectives and other measures designed to conserve, enhance, and restore sage-grouse habitat. These provisions were binding on the Bureau because FLPMA requires the Bureau's leasing decisions must conform to the relevant resource management plan. 43 U.S.C. § 1732(a). One of the Bureau's objectives was to prioritize oil-and-gas leasing outside suitable sage-grouse habitat. The Bureau manages sage-grouse habitat through designations of "priority habitat management areas" (PHMAs) and "general

habitat management areas" (GHMAs), and the prioritization objective operates by reference to these categories:

> Priority will be given to leasing and development of fluid mineral resources, including geothermal, outside of PHMAs and GHMAs. When analyzing leasing and authorizing development of fluid mineral resources, including geothermal, in PHMAs and GHMAs, and subject to applicable stipulations for the conservation of [greater sage-grouse], priority will be given to development in non-habitat areas first and then in the least suitable habitat for [greater sage-grouse].

2-FedER-47. In the accompanying record of decision, the Bureau characterized the prioritization objective as an effort to "limit future surface disturbance and encourage new development in areas that would not conflict" with the greater sage-grouse and to "guide development to lower conflict areas and as such protect important habitat." 2-FedER-46.

**b.** Following the adoption of the 2015 sage-grouse amendments, the Bureau issued guidance on how to implement the prioritization objective through documents called "instruction memoranda" or "IMs." In 2016, during the Obama Administration, the Bureau issued IM 2016-143 to "provide[] guidance on prioritizing implementation decisions" for oil and gas leasing and development. 4-FedER-576. The Bureau's goal in issuing the IM was "to ensure consistency" across Bureau offices implementing the 2015 sage-grouse amendments and to "provide clarity" on "how to move forward with oil and gas leasing." *Id.* To that end, IM 2016-143 provided guidance to Bureau offices on how to sequence consideration of

expressions of interest at the leasing stage and how to process permits at the development stage. 4-FedER-578-85.

In December 2017, during the first Trump Administration, the Bureau issued a new instruction memorandum, IM 2018-026, to provide guidance on the prioritization process, superseding IM 2016-143. 4-FedER-588. IM 2018-026 clarified that the 2015 sage-grouse amendments "established an objective to prioritize oil and gas leasing and development outside" sage-grouse habitat but also "allow[ed] for leasing with appropriate stipulations" in areas designated by the applicable resource management plans as open for leasing. 4-FedER-589. IM 2018-026 further explained that the 2015 sage-grouse amendments did not prohibit development in sage-grouse habitat; rather, when faced with a backlog of nominated parcels, the Bureau should prioritize first leasing those parcels that are outside sage-grouse management areas. *See id.*

**c.** Over the past decade, the 2015 sage-grouse amendments have been subject to extensive litigation and review. States, environmental groups, and representatives of the oil-and-gas industry all challenged the 2015 sage-grouse amendments soon after their adoption during the Obama Administration. *See W. Watersheds Project v. Schneider*, No. 16-cv-83 (D. Idaho); *Otter v. Jewell*, No. 15-cv-1566 (D.D.C.), *appeal docketed sub nom. Little v. Burgum*, No. 17-5050 (D.C. Cir.). In 2017, the first Trump Administration began reevaluating the 2015 amendments, and the courts

paused the litigation to permit further deliberation over sage-grouse conservation efforts. The 2015 amendments thus went into effect, although these challenges continue to remain pending.

The Bureau issued new sage-grouse amendments in 2019 to replace the 2015 amendments. *See, e.g.*, 84 Fed. Reg. 10,325 (Mar. 20, 2019). A district court issued a preliminary injunction against the new amendments, faulting the Bureau's NEPA review. *W. Watersheds Project v. Schneider*, 417 F. Supp. 1319 (D. Idaho 2019). As a result, the Bureau continued management under the 2015 amendments. In 2021, the Biden Administration began reevaluating the 2019 amendments through a new land use plan amendment process, and the district court paused the pending litigation. In November 2024, the Bureau published proposed sage-grouse amendments, which triggered a 30-day public protest period. In January 2025, after completing the protest process, the Bureau approved new amendments for plans in two states, Colorado and Oregon. The planning process for public lands in other states covered by the proposed amendments, including Wyoming and Nevada, continued. In September 2025, the second Trump Administration proposed significant changes to the proposed amendment previously released in November 2024 and initiated a public comment period.

In late 2025, while this appeal was pending, the Bureau approved new sage-grouse amendments for the remaining states, including amendments to resource

management plans in Wyoming and Nevada—the two states at issue in this appeal. *See generally 2021 Greater Sage-grouse Land Use Plan Amendments*, BLM National NEPA Register (last updated Dec. 22, 2025), https://eplanning.blm.gov/ eplanning-ui/project/2016719/510. These new 2025 amendments supersede the 2015 amendments. The amendments to the relevant resource management plans in both Wyoming and Nevada adopt new management objectives. *See Greater Sage-Grouse Rangewide Planning; Record of Decision and Approved Resource Management Plan Amendment for Nevada and Northeastern California*, at 35-38 (Dec. 22, 2025), https://eplanning.blm.gov/public_projects/2016719/200502020/ 20148714/251048694/Nevada%20California%20GRSG%20ROD_ARMPA.pdf; *Greater Sage-Grouse Rangewide Planning; Record of Decision and Approved Resource Management Plan Amendment for Wyoming*, at 34-37 (Dec. 22, 2025), https://eplanning.blm.gov/public_projects/2016719/200502020/20148727 /251048707/Wyoming%20GRSG%20ROD-ARMPA.pdf.

The new amendments do not include the 2015 amendments' prioritization objective, as shown in appendices to the amendments that compare features of the 2015 amendments, the 2019 amendments, and the 2025 amendments. *See Greater Sage-Grouse Rangewide Planning; Record of Decision and Approved Resource Management Plan Amendment for Nevada and Northeastern California*, *Appendix 2* at 2-55, BLM National NEPA Register (Dec. 22, 2025), https://eplanning.blm.gov/

public_projects/2016719/200502020/20148751/251048731/Nevada%20California%20GRSG%20Appendix%2002%20Comparison%20of%20Prior%20GRSG%20RMP%20Direction%20(1).pdf; *Greater Sage-Grouse Rangewide Planning; Record of Decision and Approved Resource Management Plan Amendment for Wyoming*, *Appendix 2* at 2.1-4, 2.2-28, 2.3-1, 2.5-1, BLM National NEPA Register (Dec. 22, 2025), https://eplanning.blm.gov/public_projects/2016719/200502020/20148726/251048706/Wyoming%20GRSG%20Appendix%2002%20Comparison%20of%20Prior%20GRSG%20RMP%20Direction.pdf.

The 2025 sage-grouse amendments for Wyoming are currently the subject of an action seeking a declaratory judgment that the Bureau complied with its legal obligations. *See W. Energy All. v. Dep't of Interior*, No. 25-cv-299 (D. Wyo.).

### 3.    The One Big Beautiful Bill Act

In July 2025, Congress significantly revised aspects of the oil and gas leasing process through a budget reconciliation act, Pub. L. No. 119-21, 139 Stat. 72, known as the One Big Beautiful Bill Act (OBBBA). Among other goals, these revisions were designed to address "quarterly onshore oil and gas lease sales" in several states, including Wyoming and Nevada. H.R. Rep. 119-106, at 2006 (May 20, 2025) (Book 2 of 2). The Congressional Budget Office estimated that these provisions would "collectively generate up to $12 billion in revenue and savings for the federal government." *Id.*

Section 50101(b)(3) of the OBBBA amended the Mineral Leasing Act to address how and when oil and gas leases are offered for sale. 139 Stat. 137-38 (amending 30 U.S.C. § 226(b)(1)(A)). The Mineral Leasing Act provides for leasing of "eligible" lands that are "available" for lease, and the OBBBA further defines these terms to guide the Bureau's selection of lands to offer for lease at its quarterly sales. *See id.* In full, the statute provides:

> For purposes of the previous sentence [in 30 U.S.C. § 226(b)(1)(A)], the term 'eligible lands' means all lands that are subject to leasing under this Act and are not excluded from leasing by a statutory prohibition, and the term 'available' with respect to eligible lands, means those lands that have been designated as open for leasing under a land use plan developed under section 202 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1712) and that have been nominated for leasing through the submission of an expression of interest, are subject to drainage in the absence of leasing, or are otherwise designated as available pursuant to regulations adopted by the Secretary.

139 Stat. 137-38. Through this provision, Congress expressly codified the Bureau's longstanding practice of relying on industry nominations to aid in determining which parcels to offer for lease. *Id.*; *see also* 30 C.F.R. § 3120.31.

Next, section 50101(c) reinforced that the Mineral Leasing Act's direction for the Bureau to conduct quarterly lease sales. "[E]ach fiscal year, the Secretary of the Interior shall conduct a minimum of 4 oil and gas sales of available land" in each of nine different states, including Wyoming and Nevada. 139 Stat. 138 (codified as a note to 30 U.S.C. § 226). When "conducting a lease sale" in these states, the Bureau

14

"shall offer not less than 50 percent of available parcels nominated for oil and gas development under the applicable resource management plan in effect." *Id.*

Lastly, section 50101(d) of the OBBBA further provided that the Bureau "shall" make parcels available for leasing within 18 months of receiving an expression of interest. 139 Stat. 138-39 (replacing 30 U.S.C. § 226(a)); *see also* H.R. Rep. 119-106, at 2006 (explaining that this provision "[r]equires" the Bureau to offer certain parcels "within 18 months of the date of receipt of an expression of interest"). Specifically, the statute provides:

> Any parcel of land subject to disposition under this Act that is known or believed to contain oil or gas deposits shall be made available for leasing, subject to [a provision addressing resource management plans], by the Secretary of the Interior, not later than 18 months after the date of receipt by the Secretary of an expression of interest in leasing the applicable parcel of land available for disposition under this section, if the Secretary determines that the parcel of land is open to oil or gas leasing under the approved resource management plan applicable to the planning area in which the parcel of land is located that is in effect on the date on which the expression of interest was submitted to the Secretary (referred to in this subsection as the 'approved resource management plan').

139 Stat. 138-39.

## B. Factual and procedural background

Plaintiffs Montana Wildlife Federation, The Wilderness Society, National Audubon Society, and National Wildlife Federation sued the Bureau in April 2018 to challenge oil and gas development across the western United States. Relying on the Administrative Procedure Act (APA), 5 U.S.C. § 706, Plaintiffs sought vacatur

of oil and gas leasing policies and actions that allegedly affected the habitat of the greater sage-grouse, including lease sales in Wyoming and Nevada. Among other claims, Plaintiffs argued that the Bureau violated FLPMA by failing to comply with the then-governing 2015 sage-grouse amendments' prioritization objective. Given the great number of issues and agency actions in the case, the parties agreed to litigate the case through several sequential "phases" of summary judgment on subsets of claims challenging different Bureau actions.

### 1. Phase 1 proceedings

**a.** The district court scheduled an initial "phase 1" of briefing on claims challenging, among other things, several of the Bureau's leasing decisions in Montana and Wyoming and IM 2018-026, the Trump Administration's guidance on complying with the 2015 sage-grouse amendments' prioritization objective. Wyoming, Montana, and the Western Energy Alliance all intervened as defendants.

The court granted summary judgment to Plaintiffs in part in May 2020. 4-FedER-574. The court held that IM 2018-026 unlawfully failed to conform to the 2015 sage-grouse amendments, primarily because IM 2018-026 provided that implementation of the prioritization objective could be limited to circumstances where the Bureau had a backlog of nominations to process. 4-FedER-563-68. The district court also held that all of the challenged leasing decisions followed the same approach to prioritization as IM 2018-026 and thus violated the 2015 sage-grouse

amendments for the same reason, regardless whether the Bureau actually relied on IM 2018-026 when conducting the sales. 4-FedER-568-70. The district court then vacated the 2018 IM and the leasing decisions, concluding that remand without vacatur was not warranted under the circumstances. 4-FedER-571-73. But the court granted a stay pending appeal. 4-FedER-542.

The Bureau, Wyoming, and Western Energy Alliance appealed the phase 1 order in July 2020 and, following briefing, presented argument in May 2021. Meanwhile, Anschutz Exploration Corporation, one of the affected lessees, sought to intervene in district court for purposes of participating in the phase 1 appeals. After the district court denied intervention, Anschutz appealed the denial. While these intervention proceedings played out, the Court withdrew submission of the merits appeals filed by the Bureau, Wyoming, and Western Energy Alliance. The Court ultimately reversed the denial of intervention, *Mont. Wildlife Fed'n v. Haaland*, No. 20-35793, 2022 WL 42794 (9th Cir. 2022), and Anschutz filed its own appeal. Anschutz argued in part that the phase 1 order was defective under Federal Rule of Civil Procedure 19 for failure to join lessees whose leases would be canceled. The United States filed an amicus brief urging the Court to reject that argument, and the parties argued Anschutz's appeal in September 2023.

**b.** This Court affirmed the district court in January 2025.[2] The Court held that the 2015 sage-grouse amendments' prioritization objective "imposes an affirmative requirement on the Bureau to 'guide' and 'encourage' development away from sage-grouse habitat" and faulted the Bureau's "almost-exclusive reliance on responding to industry expressions of interest . . . in leasing specific parcels, rather than on independent agency determinations of which parcels to offer for oil and gas leases." *Mont. Wildlife Fed'n*, 127 F.4th at 43. The Bureau's view of prioritization "d[id] not actively encourage development outside of or seek to minimize impacts on sage-grouse habitat and so is inconsistent" with the 2015 amendments." *Id.* The Court thus held that IM 2018-026 was unlawful.

The Court then held that the leasing decision at issue on appeal also violated the prioritization objective.[3] The Bureau argued that the leasing decision complied with the prioritization objective, regardless of any defect in IM 2018-026, but the Court disagreed. The Court faulted the Bureau for relying on expressions of interest from industry to determine what parcels to offer for the sale rather than taking

---

[2] The Court also decided a separate but similar case in the same opinion. That case, *Western Watersheds Project v. Haaland*, No. 18-cv-187 (D. Idaho), was also a challenge to the Bureau's leasing policies and decisions focused on the greater sage-grouse and proceeded in parallel. The panel heard argument in both cases together.

[3] Only a June 2018 sale in Wyoming was contested on appeal; the other leasing decisions at issue in phase 1 had been vacated separately in unrelated litigation.

"action to guide and encourage development outside of sage-grouse habitat." *Mont. Wildlife Fed'n*, 127 F.4th at 46.

The Court also rejected the Bureau's argument that the district court abused its discretion by vacating the leasing decision rather than remanding without vacatur. The Bureau contended that the Bureau could fix any prioritization issue on remand, but the Court concluded that the seriousness of the error favored vacatur. The Bureau also argued that the disruptive consequences of vacatur, which would require the Bureau to cancel leases and refund $36 million in revenue, weighed against vacatur. But the court concluded that the scope of the error outweighed the disruptive consequences.

Judge Boggs, dissenting, would have held that the lease sale complied with the prioritization objective, concluding that the sale would have passed muster under the Obama Administration's IM 2016-143. Judge Boggs observed that the majority's interpretation of "prioritization" was atextual and insufficiently deferential to the Bureau. Wyoming and Western Energy Alliance petitioned for rehearing en banc, and the petition was denied in May 2025.

### 2. Phase 2 proceedings

While the phase 1 proceedings unfolded in this Court, the district court moved forward with phase 2. In phase 2, Plaintiffs argued that five of the Bureau's oil and

gas lease sales conducted in Wyoming and Nevada in 2017 and 2018 also violated the 2015 sage-grouse amendments' prioritization objective.

**a.** Two of the sales were held in Wyoming. In the December 2017 Wyoming sale, the Bureau offered 45 parcels for lease, totaling about 72,884 acres of land. 3-FedER-262. This sale was conducted under IM 2016-143, the Obama Administration's guidance on complying with the 2015 sage-grouse amendments' prioritization objective. 3-FedER-323. Three of the 45 parcels offered at this sale were outside sage-grouse habitat. 3-FedER-273; 3-FedER-280. In the March 2018 Wyoming sale, the Bureau offered 170 parcels for lease, totaling about 170,550 acres of land. 3-FedER-379; 3-FedER-459. This sale was also conducted under IM 2016-143. 3-FedER-392; 3-FedER-533. 57 of the 170 parcels offered at this sale were outside sage-grouse habitat. 3-FedER-437; 3-FedER-519.

The three other lease sales were held in Nevada. In the December 2017 Nevada sale, the Bureau offered 208 parcels for lease, totaling about 388,697 acres of land. 2-FedER-43. This sale was conducted under IM 2016-143, 2-FedER-56, and roughly five percent of the parcels are not in sage-grouse habitat, 1-FedER-9. In the March 2018 Nevada sale, the Bureau offered 40 parcels for lease, totaling about 69,691 acres of land. 2-FedER-63. There was significant overlap with sage-grouse habitat. 2-FedER-60. In the June 2018 Nevada sale, the Bureau offered 166 parcels for lease, totaling about 313,715 acres of land. 2-FedER-87. Less than a third of

20

those parcels intersected with sage-grouse habitat. 2-FedER-74. This sale applied IM 2018-034, the first Trump Administration's guidance. 2-FedER-244.

**b.** The district court issued its phase 2 decision in March 2022, before this Court issued its phase 1 decision addressing the 2015 sage-grouse amendments and the prioritization objective. The district court vacated all five leasing decisions for violating the prioritization objective, relying heavily on its own phase 1 decision. 1-FedER-002-15. The court faulted the Bureau for failing to affirmatively guide development away from habitat, failing to consider deferring parcels from the sale, and failing to address prioritization expressly in the Bureau's documentation supporting the sales. 1-FedER-8-12.

The court also declined the Bureau's request to remand the leasing decisions without vacatur. The court concluded that the Bureau's "errors in granting these leases" had "undercut the purpose" of the 2015 sage-grouse amendments' prioritization objective and "prevent[ed] the Bureau from "fulfilling the requirement's goals." 1-FedER-13. These errors, the court reasoned, "infected every step of the environmental assessment process" and could not be remedied on remand. 1-FedER-13. The court sua sponte stayed its decision pending appeal. 1-FedER-14-15.

**c.** The Bureau, Wyoming, Western Energy Alliance, and lessees appealed the district court's phase 2 order in 2022. The parties agreed to hold the cases in

21

abeyance pending resolution of the phase 1 appeals, given the overlap in issues. The Court lifted the abeyance following the issuance of the phase 1 mandate in May 2025. The district court case remains pending; the court is proceeding with phase 3.

## SUMMARY OF ARGUMENT

The Bureau's phase 2 leasing decisions come before this Court in a significantly different posture from the phase 1 leasing decision, and remand without vacatur is the appropriate remedy for any violations of the 2015 sage-grouse amendments' prioritization objective in phase 2.

**1.** Any error in the phase 2 leasing decisions is mitigated by intervening developments and distinctions in the phase 2 leases. After this Court issued its phase 1 leasing decision, Congress enacted the OBBBA and revised the Mineral Leasing Act to make clear that the Bureau's historical practice of relying on expressions of interest is consistent with congressional design. Indeed, the Bureau is now required to process expressions of interest, a practice that this Court's phase 1 decision faulted in its analysis of the Bureau's conformance with the 2015 sage-grouse amendments' prioritization objective. The Bureau has also issued new 2025 sage-grouse amendments that remove the prioritization objective, which had created confusion and was not necessary to the Bureau's sage-grouse conservation efforts. These developments make clear that the Bureau's phase 2 leasing decisions align with statutory and agency policy.

Many of the phase 2 leases also were not issued under the guidance of IM 2018-026, which this Court faulted in its phase 1 decision for misconstruing the 2015 sage-grouse amendments' prioritization objective. Many leases were instead issued at least in part under the unchallenged IM 2016-143, the guidance document issued by the administration that adopted the 2015 sage-grouse amendments. Even if the Court were to conclude that the Bureau's own guidance on its own amendments has always been faulty, any error in the phase 2 process could not have been as significant as in phase 1. The Bureau can revisit and reconsider its decision to issue these leases through a remand that allows for tailored consideration, rather than a sweeping vacatur that would wipe all the leases off the books.

**2.** The consequences of vacating the phase 2 leasing decisions also weigh heavily in favor of remand without vacatur. If vacatur is upheld, the Bureau will be required to cancel the leases and refund the revenue, taking money out of the Federal and state fiscs and returning it to the lessees. But under the OBBBA, these lessees can simply nominate these parcels for lease once again, and the Bureau will generally be required to offer eligible parcels at an upcoming sale conducted under the 2025 sage-grouse amendments. That process would not result in any significant real-world effect on sage-grouse habitat and instead create financial difficulties for the United States and the states where the leases are located. The better course is to remand the leases without vacatur. If the Court concludes that some limitations on a

remand are appropriate, the Court can enjoin any further surface-disturbing activities to limit effects on sage-grouse habitat, while permitting development of existing wells and subsurface development arrangements.

## STANDARD OF REVIEW

The district court's choice of equitable remedy is reviewed for an abuse of discretion. *Mont. Wildlife Fed'n*, 147 F.4th at 50.

## ARGUMENT

The phase 2 leasing decisions should be remanded to the Bureau without vacatur. Vacatur is this Court's presumptive remedy for a violation of the Administrative Procedure Act, but the Court retains equitable discretion to order the more limited remedy of remand without vacatur. *Mont. Wildlife Fed'n*, 127 F.4th at 50. To determine whether remand without vacatur is warranted, the Court has adopted the D.C. Circuit's two-factor *Allied-Signal* test. *See Cal. Cmtys. Against Toxics v. Env't Prot. Agency*, 688 F.3d 989 (9th Cir. 2012); *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993). Under *Allied-Signal*, the Court weighs "how serious the agency's errors are" against "the disruptive consequences" of vacating the agency decision. *Mont. Wildlife Fed'n*, 127 F.4th at 50 (cleaned up). Although the Court concluded that vacatur was the appropriate remedy for the Bureau's prioritization errors in phase 1, the phase 2 leasing decisions

come before the Court in a significantly different posture, and any prioritization errors in phase 2 do not warrant the disruptive consequences of vacatur.

**I.     Any error in the Bureau's phase 2 leasing decisions is not serious enough to warrant vacatur.**

The Bureau's approach to implementing the 2015 sage-grouse amendments in the phase 2 leasing decisions does not warrant vacatur because any error is not as "serious" as the error identified in phase 1. *Mont. Wildlife Fed'n*, 127 F.4th at 50. Congress and the Bureau have now made clear that the Bureau's phase 2 leasing practices align with legislative and regulatory policy, and in any case, many of the phase 2 leasing decisions conformed to guidance predating the instruction memorandum that the Court held unlawful in phase 1.

**A.     The phase 2 leasing decisions align with legislative and regulatory policy.**

Recent developments cast new light on the Bureau's leasing program and the implementation of its sage-grouse conservation efforts. Congress has made clear that the Bureau's approach to leasing in the phase 2 leasing decisions is consistent with legislative policy, and the Bureau has clarified that its sage-grouse conservation policy does not require the approach to leasing that this Court discussed in its phase 1 decision.

**1.** In the Mineral Leasing Act, Congress directed the Bureau to conduct regular lease sales to facilitate the development of the Nation's oil and gas resources.

30 U.S.C. § 226(b)(1)(A). In determining what parcels to offer for lease at these regular sales, the Bureau has relied in part on nominations from industry— expressions of interest—seeking to match available lands to interested developers.

In the Court's phase 1 decision, the Court was troubled by the Bureau's reliance on these expressions of interest in the context of the 2015 sage-grouse amendments' objective to prioritize development outside of sage-grouse habitat. As the Court explained, the prioritization objective required something more than "processing expressions of interest" or "responding to expressions of interest," at least when industry is nominating parcels that were located in sage-grouse habitat. *Mont. Wildlife Fed'n*, 127 F.4th at 43-44. The Court observed that the Mineral Leasing Act provides the Bureau with discretion in selecting parcels for the leasing program: "The statute specifies that lands 'which are known or believed to contain oil or gas deposits *may* be leased by the Secretary.'" *Id.* at 44 (quoting 30 U.S.C. § 226(a) (2024)) (emphasis added by the Court). And the Court held that, to satisfy the 2015 sage-grouse amendments' prioritization objective, the Bureau's reliance on expressions of interest was not a permissible exercise of that discretion—at least not without more. *See id.* at 44-45 (explaining that "in some manner, the government must take an affirmative role in encouraging oil and gas leasing in non-sage-grouse habitat, rather than just passively processing expressions of interest").

A few months after this Court's phase 1 decision, Congress enacted the OBBBA and made clear that the Bureau's longstanding reliance on expressions of interest from industry to identify parcels for upcoming lease sales is legislative policy. Indeed, the OBBBA replaced in its entirety the provision of the Mineral Leasing Act that the Court cited as conferring discretion on the Bureau to defer industry nominations or to otherwise implement the prioritization objective by offering parcels that industry was not interested in developing. The statute now provides that "[a]ny parcel of land" that is "known or believed to contain oil or gas deposits *shall* be made available for leasing" no later than "18 months after the date of receipt by the Secretary of an expression of interest in leasing," so long as the lands are open to leasing under the relevant resource management plan. 30 U.S.C. § 226(a)(1). Congress also separately made clear that lands "available" for lease under the Mineral Leasing Act include lands that "have been nominated for leasing through the submission of an expression of interest." *Id.* § 226(b)(1)(A).

Through the OBBBA, Congress codified the Bureau's longstanding use of expressions of interest to guide its leasing decisions—and, in fact, mandated that the Bureau offer nominated parcels. *See* H.R. Rep. 119-106, at 2006 (explaining that the OBBBA "[r]equires" the Bureau to offer nominated parcels that are otherwise eligible and open to leasing). Although the OBBBA does not apply retroactively to the 2017 and 2018 leasing decisions in Wyoming and Nevada at issue in phase 2,

27

the statute confirms that the Bureau's decision to offer nominated parcels in these sales conforms to legislative policy and congressional understanding of the Mineral Leasing Act. Even if that practice violated the 2015 sage-grouse amendments at the time—as the Court held in phase 1—the Court may properly look to these subsequent developments when considering the seriousness of any errors in phase 2. *See*, *e.g., Seven Cnty.*, 605 U.S. at 181 n.3 (looking to subsequent legislative developments when interpreting NEPA); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). In fact, this Court's own phase 1 decision looked to the Bureau's 2024 regulations when analyzing the 2018 lease sale at issue in phase 1. *Mont. Wildlife Fed'n*, 127 F.4th at 44 n.19.

**2.** Even setting aside these legislative developments, the Bureau also made clear that its sage-grouse conservation efforts do not bar the Bureau from following its normal practice of relying on expressions of interest to determine what parcels to offer at an upcoming sale. In the 2025 sage-grouse amendments, the Bureau completely revised its approach to implementing its sage-grouse conservation efforts in the mineral leasing program. *Supra* 11-13. These revisions included removing the prioritization objective as written in the 2015 sage-grouse amendments. The Bureau explained that the removal of the prioritization objective would reduce confusion over which lands are open to leasing and with what stipulations. And the Bureau noted that this change is consistent with both the Bureau's planning guidance and

the OBBBA's requirement that the Bureau make available for lease parcels for which it receives an expression of interest. *See, e.g.*, *Greater Sage-Grouse Rangewide Planning; Record of Decision and Approved Resource Management Plan Amendment for Wyoming*, at 12-13, BLM National NEPA Register (Dec. 22, 2025), https://eplanning.blm.gov/public_projects/2016719/200502020/20148727/251048707/Wyoming%20GRSG%20ROD-ARMPA.pdf.

Importantly, the Bureau's reconsideration of the prioritization objective in the 2025 sage-grouse amendments is not a novel development or a reaction to this Court's decision. After ten years of experience with the 2015 sage-grouse amendments, the Bureau has adopted broad and detailed changes to its sage-grouse conservation policy, building on years of review and proposals for reform. For example, the proposed 2024 sage-grouse amendments—which were in development for several years—also proposed removing the prioritization objective. *See, e.g.*, *Greater Sage-Grouse Rangewide Planning; Proposed Resource Management Plan Amendment and Final Environmental Impact Statement*, *Appendix 2* at 2-NVCA-50, BLM National NEPA Register (Nov. 7, 2024), https://eplanning.blm.gov/public_projects/2016719/200502020/20122937/251022917/Appendix_02_Proposed_Existing_Mgmt_Comparison.pdf.

**3.** Given these developments, the prioritization errors the district court identified in the phase 2 leasing decisions cannot be considered as serious as the

errors this Court identified in phase 1. Congress weighed in to make clear that the Bureau has been operating its leasing program consistent with the congressional understanding of the Mineral Leasing Act. The Bureau's efforts to conserve sage-grouse habitat in its 2015 amendments to its resource management plans are necessarily subordinate to legislative direction. And in any case, the Bureau also weighed in to clarify what its own resource management plans require to further its sage-grouse conservation efforts—which does not include implementing Plaintiffs' understanding of the 2015 sage-grouse amendments' prioritization objective. The Bureau could not have committed an egregious error by conducting the phase 2 lease sales in conformance with current legislative and regulatory policy.

### B.    The phase 2 leasing decisions largely did not rely on IM 2018-026.

The Court's phase 1 decision engaged with the 2015 sage-grouse amendments' prioritization objective generally, but the central focus of the phase 1 litigation—and this Court's analysis—was the Bureau's reliance on IM 2018-026, the first Trump Administration's guidance on implementing the prioritization objective. *Mont. Wildlife Fed'n*, 127 F.4th at 42-45. The Court affirmed the district court's decision to vacate the phase 1 leasing decision in large part because the Bureau applied IM 2018-026's backlog-focused interpretation of prioritization— that prioritization was a matter of sequencing nominations. *Id.* at 46. But in reaching this conclusion, the Court declined to consider the Bureau's argument that the phase

leasing decision was lawful because the sale also complied with the Obama Administration's guidance, IM 2016-143. The Court explained that "IM 2016-143 was not in effect during the lease sale," and the Court could not "know whether [the Bureau] would have proceeded with leasing all the relevant parcels if it had instead applied IM 2016-143." *Id.* at 46 n.22; *see also id.* at 55 (Boggs, J., dissenting).

Several of the leasing decisions at issue in phase 2 were conducted at least in part under IM 2016-143. The December 2017 sales in Wyoming and Nevada were largely conducted before the Bureau issued IM 2018-026, and the Bureau cited to IM 2016-143. 2-FedER-56, 3-FedER-323. The Bureau's process for deciding what parcels to offer at the March 2018 sales was already underway when IM 2018-026 issued, *see, e.g.*, 2-FedER-73, and the Bureau cited to IM 2016-143 in the Wyoming sale. 3-FedER-392; 3-FedER-533. The June 2018 sale in Nevada, in contrast, was expressly conducted under IM 2018-026. 2-FedER-244. The defects the Court identified in IM 2018-026 thus could not have infected at least three of the five phase 2 leasing decisions in the fashion the Court identified in the phase 1 leasing decision.

These sales were instead conducted under the 2016 guidance issued by the very same administration that issued the 2015 sage-grouse amendments—guidance that was issued not long after the amendments. IM 2016-143 addressed the prioritization objective by identifying a multifactor analysis to guide the Bureau's offices in determining how to sequence sequencing nominated parcels and determine

what parcels to offer. 4-ER-578-86. As Judge Boggs pointed out in his phase 1 dissent, Plaintiffs "d[id] not question the 2016 memorandum's validity," and "[i]f anything, the plaintiffs appear[ed] to argue that the Bureau of Land Management *should* have tried to comply with IM 2016-143." *Mont. Wildlife Fed'n*, 127 F.4th at 54. Even if the process outlined in the unchallenged IM 2016-143 were deemed not to conform to the objective, any prioritization errors in the phase 2 leasing decisions cannot be considered as serious as the errors in phase 1 when the phase 2 sales were held while the Bureau's own contemporaneous interpretation of the 2015 sage-grouse amendments was in effect.

### C. The Bureau can reconsider the phase 2 leases on remand.

Any failure to conform the challenged lease sales to the 2015 sage-grouse amendments' prioritization objective is fundamentally a procedural issue that can be addressed on remand. Even a "significant procedural error" may be addressed through a remand without vacatur, *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995), if the agency could substantiate its decision on remand by "complying with procedural rules." *Pollinator Stewardship Council v. Env't Prot. Agency*, 806 F.3d 520, 531 (9th Cir. 2015). And here, the Bureau can reconsider whether all the leases offered at these five sales should have been offered, taking into consideration the factual distinctions with the phase 1 leases and intervening developments that may inform the Bureau's analysis. For example, the Bureau could

plausibly substantiate its decision to offer parcels that are not located in sage-grouse habitat or leases that were offered through a sale process that was conducted under IM 2016-143 rather than IM 2018-026. Given the intervening developments, this form of orderly reconsideration on remand that permits a tailored reexamination of the relevant leasing decisions is a more equitable remedy than the blunt instrument of vacatur.

## II. The consequences of canceling the phase 2 leases weigh heavily against vacatur.

Any error in complying with the 2015 sage-grouse amendments' prioritization objective is also outweighed by the "disruptive consequences" of vacating the phase 2 leasing decisions. *Mont. Wildlife Fed'n*, 127 F.4th at 50. If the Court affirms, the Bureau will be required to refund public revenue from these five lease sales to the lessees, who can then simply submit another expression of interest for the next lease sale where the Bureau would very likely be required under the OBBBA to offer the parcel for lease again. Vacatur thus would not further the sage-grouse amendments' conservation objectives and would yield only financial hardship.

### A. Vacatur would result in significant financial harms to the federal and state governments.

The district court's phase 2 order vacating the five leasing decisions in Wyoming and Nevada will require the Bureau to cancel the leases issued at those sales and refund the resulting revenue. *See, e.g.*, *Conner v. Burford*, 848 F.2d 1441,

1460-61 & n.50 (9th Cir. 1988); *Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1154, 1156-57 (9th Cir. 1988). The economic harm from refunding lease revenue is a cognizable equitable interest, *Earth Island Institute v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010), and this Court has been sensitive to a "significant expenditure of public resources" that would be "unnecessarily wasted" by an unduly harsh order of vacatur, *Idaho Farm Bureau*, 58 F.3d at 1405-06.

The five leasing decisions at issue in phase 2 resulted in 225 leases in effect at the time of Bureau's submissions to the district court. 2-FedER-19; 2-Fed-ER-38. These leases covered more than 223,268 acres of land, and the Bureau collected approximately $22.6 million in revenue from the phase 2 lease sales. 2-FedER-19; 2-Fed-ER-38. Under the Mineral Leasing Act, nearly half of this revenue is distributed to the states where the lands are located—here, primarily Wyoming. 30 U.S.C. § 191(a). As the Bureau explained to the district court, this "critical funding has been allocated to State budgets," which makes it "extremely difficult" for the federal government to recoup the revenues from state governments for refund to the lessees. 2-FedER-21-22. Recouping the lost funds likely would require complex negotiations between the Department of the Interior's Office of Natural Resource Revenue and its state counterparts, which could include negotiating offsets against each state's future revenue from federal leasing. 2-FedER-29-30.

Beyond just the leases, phase 2 includes leases with actual production. At the time of the Bureau's submissions to the district court, the Bureau had identified two producing wells on leases in Wyoming and Nevada, seven leases that had subsurface production (through horizontal wells drilled on other parcels outside the federal lease), and other leases for which the Bureau had already approved applications to drill before the district court issued its phase 2 decision. 2-FedER-20-23. Canceling leases with wells that already have been drilled poses further challenges and uncertainty. The wells may need to be plugged and abandoned, raising the need for reclamation and risk of environmental harm. 2-FedER-25-27. These efforts would be costly—an average well costs $106,000 to plug—and potentially wasteful if the lease is quickly nominated again and sold. 2-FedER-26-27. Some wells that penetrate leased minerals also penetrate non-federal minerals, and requiring lessees to plug those wells could prevent production from non-federal minerals. *See* 2-FedER-25. And because bids are public information, the current lessee might also be at a disadvantage in a future auction for the same lease because competitors now know the winning bid from the prior auction. *See* 2-FedER-30.

These costs and administrative burdens are unwarranted when the Bureau's conduct of the phase 2 sale complies with the Mineral Leasing Act, the OBBBA, and the 2025 sage-grouse amendments. The better course would be to order the leasing decisions remanded to the Bureau without vacatur for reconsideration while

keeping the status quo in place. The Court could issue an order maintaining that status quo by enjoining any further surface-disturbing activity during the pendency of any remand. *See, e.g.*, *Conner*, 848 F.2d at 1461-62. That form of remedy would avoid disruption of already-producing wells—where continued production has limited further effects on any sage-grouse habitat—and leasing arrangements for subsurface minerals that do not involve surface-disturbing activity on federal lands (for example, when federal minerals are part of a communitization agreement). That remedy would also further Plaintiffs' ultimate goal of limiting any potential disruptions to sage-grouse habitat while the Bureau revisits its leasing decisions.

**B.      The Bureau would likely be required to reoffer nominated parcels for lease at an upcoming sale.**

The disruptive consequences of lease cancelations and refunds are particularly unwarranted because vacatur of the leasing decisions on prioritization grounds is unlikely to yield any significant difference in whether leases are developed. If the leases are vacated, the lands will then be available for leasing under the terms of the Mineral Leasing Act as recently amended by the OBBBA. And the OBBBA requires the Bureau to offer parcels nominated by industry through an expression of interest for lease within 18 months of receipt of the nomination, so long as those lands are open to leasing under the applicable resource management plan. 30 U.S.C. §§ 226(a)(1), (b)(1)(A). If any current lessee holding one of the phase 2 leases still wishes to develop the lease, the lessee can simply submit an expression of interest

to the Bureau after the lease is vacated, and if the parcel is still open for leasing under the resource management plan, the Bureau would be required to offer the parcel again. And the resulting sales will be conducted under the 2025 sage-grouse amendments, which do not contain the 2015 amendments' prioritization objective.

In other words, the Bureau would not have discretion to decline to offer the nominated parcel for lease. The main real-world effect of vacating the lease for nonconformance with the 2015 sage-grouse amendments would simply be the return of revenue to the lessee—which, depending on market conditions, could be a windfall for a lessee that then obtains the same lease for a lower cost at a future auction. Of course, there would be some delay in the lessee's ability to develop the lease, given the administrative requirements and the time before a new sale, but that would be an incidental result of vacatur rather than a substantive change in the determination whether to offer particular parcels for lease based on their habitat status. The main result of vacatur would thus be the transfer of public funds back to the very same companies seeking to lease these lands for development.

Because the legal landscape has changed so significantly, vacating the leasing decisions is no longer the most equitable remedy for a determination that leasing decisions do not conform with the 2015 sage-grouse amendments, notwithstanding the Court's affirmance of the district court's decision to order that remedy in phase

1. The Court should instead order that the leasing decisions be remanded without vacatur for reconsideration.

**CONCLUSION**

For these reasons, the district court's decision to vacate the leasing decisions should be reversed, and this Court should order the district court to remand the decisions without vacatur. If the Court concludes some limitations on remand are appropriate, the Court should enjoin further surface-disturbing activities on the leased parcels pending completion of the remand, permitting continued production from existing wells and subsurface leasing arrangements that do not involve surface disturbances to sage-grouse habitat.

Respectfully submitted,

/s/ *Daniel Halainen*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
LUTHER L. HAJEK
DANIEL HALAINEN
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-3329
daniel.j.halainen@usdoj.gov

Of Counsel:

CLARE BORONOW
*Attorney*
U.S. Department of the Interior

January 14, 2026
90-1-4-15410

**STATEMENT OF RELATED CASES**

Each of the following is related within the meaning of Circuit Rule 28-2.6:

- *Montana Wildlife Federation v. Burgum*, 9th Cir. No. 22-35365 (docketed May 11, 2022) (Wyoming's appeal from the phase 2 order).

- *Montana Wildlife Federation v. Burgum*, 9th Cir. No. 22-35366 (docketed May 11, 2022) (Western Energy Alliance's appeal from the phase 2 order).

- *Montana Wildlife Federation v. Burgum*, 9th Cir. No. 22-35368 (docketed May 11, 2022) (lessees' appeal from the phase 2 order).

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**     22-35367

I am the attorney or self-represented party.

**This brief contains 8,694 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties;
   [ ] a party or parties are filing a single brief in response to multiple briefs; or
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**   /s/ Daniel Halainen

**Date**        January 14, 2026

# ADDENDUM

30 U.S.C. § 226 ........................................................................................ 1a

43 C.F.R. § 3120.31 ................................................................................ 3a

One Big Beautiful Bill Act, § 50101 .................................................... 5a

**30 U.S.C. § 226. Leasing of oil and gas parcels**
Effective July 4, 2025

**(a) Leasing authorized**

**(1) In general**
Any parcel of land subject to disposition under this chapter that is known or believed to contain oil or gas deposits shall be made available for leasing, subject to paragraph (2), by the Secretary of the Interior, not later than 18 months after the date of receipt by the Secretary of an expression of interest in leasing the applicable parcel of land available for disposition under this section, if the Secretary determines that the parcel of land is open to oil or gas leasing under the approved resource management plan applicable to the planning area in which the parcel of land is located that is in effect on the date on which the expression of interest was submitted to the Secretary (referred to in this subsection as the "approved resource management plan").

**(2) Resource management plans**

**(A) Lease terms and conditions**
A lease issued by the Secretary under this section with respect to an applicable parcel of land made available for leasing under paragraph (1)--

**(i)** shall be subject to the terms and conditions of the approved resource management plan; and

**(ii)** may not require any stipulations or mitigation requirements not included in the approved resource management plan.

**(B) Effect of amendment**
The initiation of an amendment to an approved resource management plan shall not prevent or delay the Secretary from making the applicable parcel of land available for leasing in accordance with that approved resource management plan if the other requirements of this section have been met, as determined by the Secretary.

1a

**(b) Lands within known geologic structure of a producing oil or gas field; lands within special tar sand areas; competitive bidding; royalties**

**(1)(A)** All lands to be leased which are not subject to leasing under paragraphs (2) and (3) of this subsection shall be leased as provided in this paragraph to the highest responsible qualified bidder by competitive bidding under general regulations in units of not more than 2,560 acres, except in Alaska, where units shall be not more than 5,760 acres. Such units shall be as nearly compact as possible. Lease sales shall be conducted by oral bidding, except as provided in subparagraph (C). Lease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary. For purposes of the previous sentence, the term "eligible lands" means all lands that are subject to leasing under this chapter and are not excluded from leasing by a statutory prohibition, and the term "available", with respect to eligible lands, means those lands that have been designated as open for leasing under a land use plan developed under section 1712 of Title 43 and that have been nominated for leasing through the submission of an expression of interest, are subject to drainage in the absence of leasing, or are otherwise designated as available pursuant to regulations adopted by the Secretary. A lease shall be conditioned upon the payment of a royalty at a rate of not less than 12.5 percent in amount or value of the production removed or sold from the lease. The Secretary shall accept the highest bid from a responsible qualified bidder which is equal to or greater than the national minimum acceptable bid, without evaluation of the value of the lands proposed for lease. Leases shall be issued within 60 days following payment by the successful bidder of the remainder of the bonus bid, if any, and the annual rental for the first lease year. All bids for less than the national minimum acceptable bid shall be rejected. Lands for which no bids are received or for which the highest bid is less than the national minimum acceptable bid shall be offered promptly within 30 days for leasing under subsection (c) of this section and shall remain available for leasing for a period of 2 years after the competitive lease sale.

. . .

## 43 C.F.R. § 3120.31. Expression of interest process
Effective August 1, 2025

**(a)** A party submitting an expression of interest in leasing land available for disposition under section 17 of the Mineral Leasing Act must include the submitter's name and address and must submit the expression of interest through the BLM's online leasing system.

**(b)** The expression must provide a description of the lands identified by legal land description, as follows:

> **(1)** For lands surveyed under the public land survey system, describe the lands to the nearest aliquot part within the legal subdivision, section, township, range, and meridian;

> **(2)** For unsurveyed lands, describe the lands by metes and bounds, giving courses and distances, and tie this information to an official corner of the public land surveys, or to a prominent topographic feature;

> **(3)** For approved protracted surveys, include an entire section, township, range, and meridian. Do not divide protracted sections into aliquot parts;

> **(4)** For lands that have water boundaries, describe the lands based on the initial survey or deed acquiring ownership;

> **(5)** For fractional interest lands, identify the United States mineral ownership by percentage;

> **(6)** For split estate lands, where the surface rights are in private ownership and the rights to develop the oil and gas are managed by the Federal Government, submit the private surface owner's name and address.

> **(7)** For lands where the acquiring agency has assigned an acquisition or tract number covering the lands applied, submit the number in addition to any description otherwise required by this section. If the authorized officer determines that the acquisition or tract number, together with identification of the State and county, constitutes an adequate description, the authorized officer may allow the description in this manner in lieu of other descriptions required by this section.

**(c)** A submitter may submit more than one expression of interest, so long as each expression separately satisfies the requirements of paragraph (b) of this section.

**(d)** The BLM may offer for sale all or some of the lands specified in an expression of interest and may offer those lands as part of a parcel that includes lands not specified in the expression of interest.

**One Big Beautiful Bill Act**
Pub. L. No. 119-21, § 50101, 139 Stat. 137-39 (2025)

**TITLE V—COMMITTEE ON ENERGY AND NATURAL RESOURCES**
**Subtitle A—Oil and Gas Leasing**

## SEC. 50101. ONSHORE OIL AND GAS LEASING.

(a) REPEAL OF INFLATION REDUCTION ACT PROVISIONS.—

(1) ONSHORE OIL AND GAS ROYALTY RATES.—Subsection (a) of section 50262 of Public Law 117–169 (136 Stat. 2056) is repealed, and any provision of law amended or repealed by that subsection is restored or revived as if that subsection had not been enacted into law.

(2) NONCOMPETITIVE LEASING.—Subsection (e) of section 50262 of Public Law 117–169 (136 Stat. 2057) is repealed, and any provision of law amended or repealed by that subsection is restored or revived as if that subsection had not been enacted into law.

(b) REQUIREMENT TO IMMEDIATELY RESUME ONSHORE OIL AND GAS LEASE SALES.—

(1) IN GENERAL.—The Secretary of the Interior shall immediately resume quarterly onshore oil and gas lease sales in compliance with the Mineral Leasing Act (30 U.S.C. 181 et seq.).

(2) REQUIREMENT.—The Secretary of the Interior shall ensure—

(A) that any oil and gas lease sale required under paragraph (1) is conducted immediately on completion of all applicable scoping, public comment, and environmental analysis requirements under the Mineral Leasing Act (30 U.S.C. 181 et seq.) and the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); and

(B) that the processes described in subparagraph (A) are conducted in a timely manner to ensure compliance with subsection (b)(1).

(3) LEASE OF OIL AND GAS LANDS.—Section 17(b)(1)(A) of the Mineral Leasing Act (30 U.S.C. 226(b)(1)(A)), as amended by subsection (a), is amended by inserting ''For purposes of the previous sentence, the term 'eligible lands' means all lands that are subject to leasing under this Act and are not excluded from leasing by a statutory prohibition, and the term 'available', with respect to eligible lands, means those lands that have been designated as open for leasing under a land use plan developed under section 202 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1712) and that have been nominated for leasing through the submission of an expression of interest, are subject to drainage in the absence of leasing, or are otherwise designated as available pursuant to regulations adopted by the Secretary.'' after ''sales are necessary.''.

(c) QUARTERLY LEASE SALES.—

(1) IN GENERAL.—In accordance with the Mineral Leasing Act (30 U.S.C. 181 et seq.), each fiscal year, the Secretary of the Interior shall conduct a minimum of 4 oil and gas lease sales of available land in each of the following States:

(A) Wyoming.

(B) New Mexico.

(C) Colorado.

(D) Utah.

(E) Montana.

(F) North Dakota.

(G) Oklahoma.

(H) Nevada.

(I) Alaska.

(2) REQUIREMENT.—In conducting a lease sale under paragraph (1) in a State described in that paragraph, the Secretary of the Interior—

(A) shall offer not less than 50 percent of available parcels nominated for oil and gas development under the applicable resource management plan in effect for relevant Bureau of Land Management resource management areas within the applicable State; and

(B) shall not restrict the parcels offered to 1 Bureau of Land Management field office within the applicable State unless all nominated parcels are located within the same Bureau of Land Management field office.

(3) REPLACEMENT SALES.—The Secretary of the Interior shall conduct a replacement sale during the same fiscal year if—

(A) a lease sale under paragraph (1) is canceled, delayed, or deferred, including for a lack of eligible parcels; or

(B) during a lease sale under paragraph (1) the percentage of acreage that does not receive a bid is equal to or greater than 25 percent of the acreage offered.

(d) MINERAL LEASING ACT REFORMS.—Section 17 of the Mineral Leasing Act (30 U.S.C. 226), as amended by subsection (a), is amended—

(1) by striking the section designation and all that follows through the end of subsection (a) and inserting the following:

**"SEC. 17. LEASING OF OIL AND GAS PARCELS.**

"(a) LEASING AUTHORIZED.—

"(1) IN GENERAL.—Any parcel of land subject to disposition under this Act that is known or believed to contain oil or gas deposits shall be made available for leasing, subject to paragraph (2), by the Secretary of the Interior, not later than 18 months after the date of receipt by the Secretary of an expression of interest in

7a

leasing the applicable parcel of land available for disposition under this section, if the Secretary determines that the parcel of land is open to oil or gas leasing under the approved resource management plan applicable to the planning area in which the parcel of land is located that is in effect on the date on which the expression of interest was submitted to the Secretary (referred to in this subsection as the 'approved resource management plan').

"(2) RESOURCE MANAGEMENT PLANS.—

"(A) LEASE TERMS AND CONDITIONS.—A lease issued by the Secretary under this section with respect to an applicable parcel of land made available for leasing under paragraph (1)—

"(i) shall be subject to the terms and conditions of the approved resource management plan; and

"(ii) may not require any stipulations or mitigation requirements not included in the approved resource management plan.

"(B) EFFECT OF AMENDMENT.—The initiation of an amendment to an approved resource management plan shall not prevent or delay the Secretary from making the applicable parcel of land available for leasing in accordance with that approved resource management plan if the other requirements of this section have been met, as determined by the Secretary.";

(2) in subsection (p), by adding at the end the following:

"(4) TERM.—A permit to drill approved under this subsection shall be valid for a single, non-renewable 4-year period beginning on the date that the permit to drill is approved."; and

(3) by striking subsection (q) and inserting the following:

"(q) COMMINGLING OF PRODUCTION.—The Secretary of the Interior shall approve applications allowing for the commingling of production

8a

from 2 or more sources (including the area of an oil and gas lease, the area included in a drilling spacing unit, a unit participating area, a communitized area, or non-Federal property) before production reaches the point of royalty measurement regardless of ownership, the royalty rates, and the number or percentage of acres for each source if the applicant agrees to install measurement devices for each source, utilize an allocation method that achieves volume measurement uncertainty levels within plus or minus 2 percent during the production phase reported on a monthly basis, or utilize an approved periodic well testing methodology. Production from multiple oil and gas leases, drilling spacing units, communitized areas, or participating areas from a single wellbore shall be considered a single source. Nothing in this subsection shall prevent the Secretary of the Interior from continuing the current practice of exercising discretion to authorize higher percentage volume measurement uncertainty levels if appropriate technical and economic justifications have been provided.".